FILED

2004 FEB -2  P 4:39

U.S. DISTRICT COURT
NEW HAVEN, CONN.

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| DOVER DAVIS | : |
| VS. | : NO. 3:02CV1039 (JBA) |
| JERRY C. LAMB and JOHN BEAUREGARD | : JANUARY 30, 2004 |

## BRIEF IN OPPOSITION TO DEFENDANT'S MOTION'S FOR SUMMARY JUDGMENT

### Facts

Plaintiff Dover Davis, a black man, met defendant Jerry Lamb in February of 2001 when Lamb Traveled to Atlanta Georgia to recruit candidates for the Clinical Data Management Certificate Program offered by Eastern Connecticut State University. Defendant Lamb was the Dean of Continuing Education at the University at that time.

The plaintiff was employed at this time as a taxi driver and met defendant Lamb during the course of transporting him to the his hotel in Atlanta. Defendant Lamb described the nature of his recruiting visit to the plaintiff and his need for minority candidate representation and the two agreed to discuss the application process further the next day.

Mr. Davis applied for admission to the program and interviewed with defendant Lamb on April 7, 2001. Mr. Davis was subsequently offered admission into the program

1

and actually moved from his home in Atlanta to Connecticut on May 16, 2001 to commence his studies.

During the second week of the fifteen week program, defendant Lamb stated in front of several other students that he would "hang him" for bringing an empty cup into the computer lab. The plaintiff was stunned by the racial undertones of the comment and objected to the remark as a racist threat. Thereafter defendant Lamb singled the plaintiff out for ostracism and unjustly criticized him for not being a team player.

On June 1, 2001, the plaintiff was the only student in the program to receive his check via mail instead of the here to fore customary hand deliverance.

During the week of June 18, 2001, the wife of defendant Lamb subjected the plaintiff to a stream of verbal abuse for no apparent reason, including falsely accusing him of being a "woman abuser".

On June 29, 2001, defendant Lamb told the plaintiff that he must be more submissive and humble. The plaintiff responded that he only wanted to be treated with dignity and respect. Defendant Lamb informed him that he would be required to show appropriate deference and respect to the others in the program.

On July 12, 2001, defendant Lamb dismissed the plaintiff from the program for the false stated reason that the plaintiff would not be able to succeed in the program or the clinical data management field. Defendant Lamb also ordered the plaintiff at this time to vacate the dormitory where he had been living and directed that he return to Atlanta.

The plaintiff appealed this decision to defendant Beauregard. On December 7, 2001, defendant Beauregard affirmed the plaintiff's termination in spite of being informed of the facts surrounding the dismissal. No other student had ever been terminated from the program for conduct comparable to that attributed by the defendants to the plaintiff.

On August 22, 2001 the plaintiff entered into an agreement with the University to resolve outstanding issues regarding his unjust termination from the program. There were actually two agreements created, for the first agreement the plaintiff was assisted by attorney Sandy Moore. However, attorney Moore did not assist the plaintiff in the second agreement dated August 22, 2001. On August 24, 2001 the plaintiff received a check in the amount of $1637.00, which did not represent full payment of money due the plaintiff. On August 24, 2001 the plaintiff informed the defendants that he was rescinding the agreement.

**Standard for Summary Judgment**

Even if the nonmoving party's evidence appears "implausible," the court may not "weigh" the evidence and must proceed with the greatest caution. R. B. Ventures, Ltd. v. Shane, 112 F.3d 54, 58-59 (2d Cir. 1997). "If reasonable minds could differ as to the import of the evidence...and if...there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." Id. at 59, quoting Brady v.

Town of Colchester, 863 F.2d 205, 211 (2d Cir. 1988), and In re Japanese Elec Prods. Antitrust Litigation, 723 F.2d 238 (3d Cir. 1983) (internal quotation marks omitted).

"A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non moving party.' Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, '[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.'" Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1535 (2d Cir. 1997). Citing Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996).

When passing upon a motion for summary judgment, the court may not resolve factual disputes or make credibility determinations, even if the case is one which eventually will be tried without a jury. In re Unisys Savings Plan Litigation, 74 F.3d 420 (3d Cir. 1996). Rather, the court must resolve any ambiguities and draw all inferences against the moving party. Appleton v. Board of Education, 254 Conn. 205, 757 A.2d 1059 (2000); Cargill, Inc. v. Charles Kowsky Resources, Inc., 949 F.2d 51 (2d Cir. 1991). The evidence of the party against whom summary judgment is sought must be believed. Revak v. SEC Realty Corp., 18 F.3d 81 (2d Cir. 1994). The court must construe the evidence in the light most favorable to the party opposing summary judgment and deny the motion unless no construction of the evidence could support judgment in the plaintiff's favor. Appleton, supra; Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970); Olin Corp. v. Consolidated Aluminum Corp., 5 F.3d 10, 14 (2d

4

Cir. 1993); <u>United States v. Certain Funds on Deposit in Scudder Tax Free Investment Account #2505103</u>, 998 F.2d 129 (2d Cir. 1993); <u>Union Pacific Corp. v. United States</u>, 5 F.3d 523, 525 (Fed. Cir. 1993); <u>Suarez v. Dickmont Plastics Corp.</u>, 229 Conn. 99, 105 (1994); <u>D.H.R. Construction Co. v. Donnelly</u>, 180 Conn. 430, 434 (1980); <u>Connell v. Colwell</u>, 214 Conn. 242, 246-47 (1990). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." <u>Gummo v. Village of Depew</u>, 75 F.3d 98, 107 (2d Cir. 1996).

To raise a genuine issue of material fact sufficient to defeat a summary judgment motion, the opponent need not match, item for item, each piece of evidence proffered by the moving party. So long as the opponent has offered enough evidence to exceed the "mere scintilla" threshold, summary judgment is to be denied. <u>In re Unisys Savings Plan Litigation</u>, <u>supra</u>, 74 F.3d 420, 433.

"In ruling on a motion for summary judgment, the court must decide whether there is a genuine issue of material fact. If there are issues of fact, the court may not resolve them without giving the parties a full hearing....Summary judgment is not appropriate in cases involving mixed questions of law and fact, such as negligence actions....Summary judgment should not be used in cases that are complex...; in cases that concern important public issues or questions of inference as to motive or intent; ...or in ones that involve subjective feelings and reactions." <u>Gould v. Mellick & Sexton</u>, 66 Conn. App. 542, 556 (2001)

5

### Mutual Mistake and Misunderstanding Regarding the Agreement

The purported settlement agreement and general release was entered into on August 22, 2001. At that signing of that agreement the plaintiff was not represented by counsel. At his deposition the plaintiff testified that attorney Sandy Moore was involved only in the first draft agreement that was later abandoned in favor of a new agreement. That new agreement was the one signed on August 22, 2001. According to the plaintiff, attorney Moore did not participate nor assist him during the second and ultimately final version of the agreement. Attorney Sullivan questioned Mr. Davis at length at his deposition:

> Q: My question is, did Sandy Moore, Attorney Sandy Moore participate n the negotiation of draftings and signing of this document in any way?
>
> A: And my answer is this–we signed two documents, two of these. We signed one when she was–she did participate. I believe there was an August 16 one.
>
> Q: Were you represented up until August 30, 2001 by attorney Moore? Either you were or you weren't.
>
> A: This particular date, August 30, is the date that I remember that I did not have her representation.... I think she only represented me once, that was the first meeting which was August the 16th, and that first agreement which was this one,...

(Plaintiff deposition, pages 97-98)

6

It is the plaintiff's contention that he was not represented or assisted by counsel in the drafting of the final agreement between him and the University. The agreement as written resulted in a mutual mistake rendering the agreement voidable by Mr. Davis. "Rescission of a contract on the ground of mutual mistake may be granted in a proper case where the mistake is common to both parties and by reason of each has done what neither intended. Buol Mach. Co. V. Buckens, 153 A.2d 826 Conn. 1959) Additionally "[i]t is generally accepted...[that] the language of a contract is typically construed most strongly against the party whose language it is and for whose benefit it was inserted." Dainty Rubbish Service, Inc v. Beacon Hill Association, 630 A.2d 115 (1993)

The Restatement (Second) of Contracts § 152 (1981) states that "[w]here a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performance, the contract is voidable by the adversely affected party unless he bears the risk of the mistake under the rule stated in § 154.

That is the situation with regard to this agreement. Section 9 of the agreement states that "Eastern also agrees to pay/reimburse the following costs/expenses to Mr. Davis..." the agreement lists the amounts of payment and then continues in section 10 with "Eastern further agrees to reimburse Mr. Davis' prior housing costs, which were itemized by Mr. Davis..." While it is true that Section 4 of the agreement states "upon completion of the two-week independent study on August 31, 2001, Mr. Davis will be

7

awarded a Clinical Data Manager Certificate" nowhere in the agreement does it mention with any specificity when Mr. Davis was to be paid.

The mistake in this instance is mutual. All three elements as articulated in § 152 of the Restatement are satisfied. First the mistake concerns a basic assumption on which the agreement was based. In this case the plaintiff was under the mistaken belief that he would be paid in one lump sum for all his expenses. Given that he had relocated to Connecticut to participate in the Eastern program and had no local resources to rely upon, his subjective belief that he would be paid in full by the University was a basic assumption to enticing him to sign the agreement. The plaintiff had numerous outstanding debts and other expenses that he was relying on the disbursement from the University to satisfy. The University was also operating under the mistaken belief that they could pay the plaintiff in several installments and at any time up to August 31, 2001. The agreement is silent on this important and basic assumption. Indeed, the memorandum of law in support of the motion to dismiss makes this very point stating, "[i]t should be noted that there is no provision in the Agreement which establishes the manner in which the University was supposed to pay the Plaintiff." (Defendant Lamb Memorandum of Law, page 14) When partial payment was made to him, the plaintiff had no other option but to consider that there had been a material breach in the terms of the agreement and that the agreement was now void.

The second element of the Restatement § 152 is also met. As stated the plaintiff anticipated that the money would be disbursed to him in full. This mistake had a

8

material effect on the plaintiff that induced him to sign the agreement in the first place. The degree of trust between the two sides was not strong. Each side had much to lose. When the plaintiff received only a portion of the anticipated funds, he was not about to trust the University to honor the terms of the agreement. Clearly they had not had a meeting of the minds as to the agreed exchange of performances.

This aspect of the agreement was touched upon during the deposition of the plaintiff as well. The defendant's attempted to salvage the agreement by tendering another check to the defendant to satisfy the entire amount of the funds to be paid to the defendant under the agreement.

> Q: Now, according to the memorandum you refused to accept this check; is that correct?
>
> A: This check was never given to me. When I received one check for $1,600, and based on the agreement the total amount was $2,573.
>
> Q: [D]id anyone from the university try to come down and give you a check,..?
>
> A: I received a phone call from Dave Trainor, and he said that I have a check here for you, and I said, Dave, the agreement has been rescinded.... I rescinded the agreement yesterday.
>
> Q: So you refused to accept this check?
>
> A: Because there was not an agreement. See, I called him the day before I rescinded the agreement and asked him about the check, and he hanged the phone up in my face. He did not say, we have a check here for you, he just

9

simply hanged the phone up in my face and said nothing about a check at all. See, the payment was supposed to be one–

Q: Did you receive a check earlier than this, a different check?

A: I received a check for $1,600.

Q: You cashed that?

A: Yes sir, but that check was supposed to have been $2,500, not $1,600.

Q: Could you point to me where in that document it says that it needs to be in one check, the payment to you needs to be in one check?

A: If you look at section 9a through 10. That paragraph states that Eastern agrees to pay this amount, it does not say anything about partial payment, full payment, anything, it was understood that there would be one check.

Q: So it doesn't say anywhere in this document that it needs to be in one check, two checks, three checks, four checks?

A: Exactly.

Q: It is silent on that.

A: Exactly.

(Plaintiff deposition, pages 111-114)

The third element of the Restatement § 152 calls for the adversely affected party not to bear the risk of mistake. In this case there is no provision or language in the agreement assigning risk of mistake to the plaintiff. Section 154 of the Restatement lists three ways in which the risk of loss will be allocated to a party. The first method is

10

by agreement of the parties. The second method is if the party is "aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient", or finally the risk is allocated to him "by the court on the ground that it is reasonable in the circumstances to do so." None of these three circumstances apply. Accordingly all three elements necessary for rescinding an agreement based on mutual mistake are satisfied in this case.

Along these same lines is the doctrine of misunderstanding, which is again illustrated in the Second Restatement of Contracts § 20(1). That section states for there to be a contract there must be a meeting of the minds. If both parties think they are agreeing to the same terms, yet each has a different subjective belief about what the deal is, it may prevent an agreement from existing at all. If the misunderstanding concerns a material term, and neither party know or has reason to know of the misunderstanding, there is no contract.

The agreement as reached and discussed above contains sections that are ambiguous and unclear. The plaintiff subjectively believed he would be paid in one payment and the defendant maintains that they were able to pay in multiple checks if they so chose. Based on this material misunderstanding between both parties, the contract is not merely voidable, but did not exist at all.

11

The defendant's memorandum explores at length the requirements of <u>Town of Newtown v. Rumery</u>, however the threshold issue in this case does not warrant a discussion of a case dealing with prosecutorial misconduct and criminal charges.

### "Same Actor" Inference is Predicated on an Employer/Employee Relationship and Even Then is Only One Factor in Determining Discrimination

The "same actor" inference states "that if the same person who fires an *employee* is the same person that hired him, one cannot logically impute to that person an invidious intent to discriminate against that employee." <u>Choate v. Transport Logistics Corp.</u>, 234 F.Supp.2d 125, 130 (2002) Additionally, "[t]he same actor inference applies with the greatest force where the act of hiring and firing are not significantly separated in time." <u>Id</u>.

In short, the "same actor" inference is a vehicle most properly utilized in an employment discrimination case. In the instant case we have a State University, and individual defendant's who did not hire the plaintiff nor fire him, but rather granted him admission to an academic program. The difference between the two is significant in that an employer/employee relationship generally has no fixed duration and may last indefinitely. In an academic setting there is a regulated and fixed course of study that rarely exceeds three years in length. Because "the Second Circuit has applied the inference even where the hiring and firing occurred three years apart[,]" the application of the "same actor inference" would always act as a complete legal bar to a claim of discrimination as long as the same person who accepted the student into the program

also claimed to be the one who dismissed the student. Id. at 130-131  The role of this particular inference just does not have the same impact that it does in an employment setting and to apply it in an academic setting would expand it far beyond it's origins and stated purpose.

Even if the court saw fit to expand the "same actor" inference to include academic programs, the inference does not mandate a finding of non-discriminatory behavior.  In Copeland v. Rosen, 38 F.Supp.2d 298, 305 (1999) the court rejected "defendants' contention that the 'same actor' inference *mandates*, at the summary judgment stage or any other, that no inference of discriminatory intent may be drawn in these circumstances.  The 'same actor' inference is not a necessary inference, it is only a plausible one, and decisions in this Circuit addressing it have warned that its use is not to become a substitute for a fact-intensive inquiry into the particular circumstances of the case at hand.

In this case the plaintiff was recruited and accepted by defendant Lamb only to be later dismissed by defendant Lamb for discriminatory reasons.  The defendant's interaction with the plaintiff was limited at best prior to his beginning the program.  The defendant might have expected the plaintiff to be subservient and deferential to him as a result of his accepting him into the program.  When it became clear, and quite quickly, that the plaintiff was not going to allow himself to treated unfairly and unjustly because he was black, defendant Lamb decided to dismiss him from the program.  "There are a variety of plausible explanations of such "hire-fire" conduct that may support and

13

inference of discriminatory animus. For example, it is plausible that a supervisor who has not previously worked with members of a certain protected class would come to realize his or her animus toward individuals in that group only upon actually hiring and working with such persons. It is further plausible that even a supervisor who previously has worked congenially with members of a protected class would develop a prejudice towards them after, for example, having an experience outside the workplace with other members of that class." Id. at 305.

The Copeland court went even further in reviewing possible scenarios that might in fact be discriminatory in nature even though the same actor hired and fired the employee in a relatively brief time frame saying, "...situations may arise where a penitent supervisor is involved, one who attempts to assuage his or her guilt in harboring prejudice against other employees by hiring members of the protected class, only later to find himself or herself overcome again by animus which leads the supervisor to terminate relevant employees." Id.

The "same actor" inference is but one area of inquiry that a trier of fact has to evaluate in coming to a decision. In an academic setting, where time frames are virtually always under three years in duration, that inference should not be allowed to dictate the outcome of the discrimination claim. In this case defendant Lamb may have harbored discriminatory intentions towards the plaintiff that only a trier of fact should decide.

### The Defendant's Are Not Entitled to Absolute or Qualified Immunity

"The qualified immunity defense may be upheld as a matter of law when the evidenced is such that, even when it is viewed in the light most favorable to the plaintiffs and with all reasonable inferences drawn in their favor, no rational jury could fail to conclude that it was objectively reasonable for the defendant to believe that she was acting in a fashion that did not violate such a right." Gottlieb v. County of Orange, 84 F.3d 511, 518 (2nd Cir. 1996); Barstow v. Shea, 196 F. Supp. 2d 141, 149 (D. Conn. 2002) (Arterton, J.). In this case a jury could certainly conclude, given the totality of the circumstances, that it was not objectively reasonable for the defendant's to conclude that they were acting in a fashion that did not violate the plaintiff rights.

"[T]he law simply does not require that we find a prior case with the exact factual situation in order to hold that the official breached a clearly established duty." Alexander v. Perrill, 916 F.2d 1392, 1397 (9th Cir. 1990). "[T]he concept of clearly established law should not be applied too literally....Instead, we merely require the parties to make a reasonable application of existing law to their own circumstances." Johnson v. Martin, 195 F.3d 1208, 1216 (10th Cir. 1999). Cf. Anaya v. Crossroads Managed Care Systems, Inc., 195 F.3d 584, 594-95 (10th Cir. 1999). "A right is clearly established if the contours of the right are sufficiently clear that a reasonable official would understand that what he or she is doing violates that right. The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the

conduct. The unlawfulness must be apparent." <u>McCullough v. Wyandanch Union Free School Dist.</u>, 187 F.3d 272, 278 (2d Cir. 1999).

### The Defendant's Are State Actors for Purposes of Fourteenth Amendment and Were Acting Under Color of Law

"The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562, 120 S. Ct. 1073, 1074-75 (2000). Citing <u>Sioux City Bridge Co. v. Dakota County</u>, 260 U.S. 441 (1923); <u>Sunday Lake Iron Co. v. Township of Wakefield</u>, 247 U.S. 340, 352 (1918).

Both defendant's were employees of Eastern Connecticut State University, a state funded and chartered entity. To suggest that there is no entwinement between the two is ludicrous. "[T]he core purpose of § 1983 is to provide compensatory relief to those deprived of their federal rights by state actors." (Internal quotation marks omitted.) <u>Kia P. v. McIntyre</u>, 235 F.3d 749, 755 (2d Cir.2000). "[U]nder certain circumstances, the actions of a private individual ... may be sufficiently related to those of the state so that the invocation of ... 42 U.S.C. § 1983 is appropriate." <u>Gray v. Project More, Inc.</u>, 469 F.Sup. 621, 623-24, aff'd., 614 F.2d 1286 (2d Cir.1979). "[I]n any § 1983 action the initial inquiry must focus on whether the two essential elements to a § 1983 action are present: (1) whether the conduct complained of was committed by a

16

person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." (Internal quotation marks omitted.) D'Amico v. Johnson, 53 Conn.App. 855, 859-60, 733 A.2d 869 (1999). Both of these prongs are satisfies in the instant case. Both defendants were employees of a state university, such that their conduct would most certainly be considered to be under the color of law. Additionally there discriminatory conduct deprived the plaintiff of rights secured by the Constitution.

### The Defendants Are Not Protected by Absolute Immunity

"Absolute immunity ... is strong medicine...." (Internal quotation marks omitted.) Lombard v. Edward J. Peters, Jr., P.C., 252 Conn. 623, 631, 749 A.2d 630 (2000). The category of persons to whom absolute judicial immunity extends is limited. Id. "The protection extends only to those who are intimately involved in the judicial process, including judges, prosecutors and judges' law clerks. Absolute judicial immunity, however, does not extend to every officer of the judicial system.... Moreover, it is important to note that even judges do not enjoy absolute immunity for administrative as opposed to judicial actions.... [Again] [t]he determination is made using a functional approach." (Citations omitted; internal quotation marks omitted.) Id. The functional approach "assumes that [i]mmunity flows not from rank or title of location within the Government ... but from the nature of the responsibilities of the individual official." (Internal quotation marks omitted.) Id., at 631 n. 4. The conduct of the defendant's in dismissing the plaintiff from the program are not shielded by the absolute immunity

defense in that they were not performing a judicial function nor were they acting as a judge for purposes of absolute immunity..

For all the above reasons the defendant's motion's for summary judgment should be dismissed.

Respectfully submitted:

TIMOTHY J. MAHONEY (ct24651)
51 Elm Street, Suite 409
New Haven, CT 06510
203.562.9931
Fax: 203.776.9494
E-Mail: jrw@johnrwilliams.com
Plaintiff's Attorney

## CERTIFICATION OF SERVICE

On the above date, a copy hereof was mailed, via first-class mail, postage prepaid, to:

Attorney June M. Sullivan
Halloran & Sage, LLP
One Goodwin Square
225 Asylum Street
Hartford, CT 06103

Attorney Michael Sullivan
Assistant Attorney General
55 Elm Street
P. O. Box 120
Hartford, CT 06141-0120

TIMOTHY J. MAHONEY